Thomas COX, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18450.

United States Court of Appeals
Eighth Circuit.

Feb. 28, 1967.

Max H. Glover, Webb City, Mo., for appellant.

John Harry Wiggins, Asst. U. S. Atty., Kansas City, Mo., F. Russell Millin, U. S. Atty., and Calvin K. Hamilton, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

Thomas Cox, age 40, and Jo Ann Reagan, age 19, were charged, by indictment returned in the Western District of Missouri, with forcibly breaking into the United States Post Office at Butterfield, Missouri, on or about December 23, 1965, in violation of 18 U.S.C. §§ 2 and 2115. Counsel was appointed for each defendant. Mrs. Reagan pleaded guilty. Cox pleaded not guilty. He was tried before a jury in Joplin, Missouri,[1] on April 19, 1966, and was convicted. A five year sentence was imposed. Cox appeals in forma pauperis.

The Butterfield post office was entered during the night of December 22–23, 1965. Several pieces of mail, primarily Christmas cards, were taken. At Cox's trial Mrs. Reagan was the principal witness for the prosecution. She testified: She was living at the time in Monett, Missouri. She met Cox at the M & L Cafe in Monett about 1:30 a. m. on December 23. She told him she needed money. He said, "I will get you some money". They drove in his car to Butterfield and stopped at the post office there. He cut a window screen but was unable to enter that way. He then broke a glass in the door, went in, and brought out "about 50 letters". They reentered but when they heard a door slam they left. They drove into the country, stopped, went through the mail but found no money, threw the letters out on the side of the road, and returned to her home.

A written statement[2] taken from Cox by postal inspectors in Kansas City on February 17, 1966, is in general agreement with Mrs. Reagan's story. The prosecution introduced the statement in evidence over objection.

The sole issue raised on this appeal is the admissibility of Cox's written confession. The defense cites Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1934), Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1063), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and asserts

"A confession given by a prisoner charged with a crime, held in custody for five weeks without benefit of counsel and not being advised of his absolute right to remain silent at the time of his interrogation, should not be admitted into evidence at his trial;

1. Butterfield is in Barry County and in the Southwestern Division of the Western District of Missouri. Court for that Division is held at Joplin. 28 U.S.C. § 105 (b) (2).

2. "I think it was early Thursday morning, December 23, 1965, when Jo Ann Reagan and I were at the M & L Cafe at Monett, Missouri.

"Before we went to the M & L Cafe we were at 'Dot's Tavern'. I had been drinking beer and Jo Ann was drinking coffee. Jo Ann was talking with me telling me about her troubles. She was crying and telling me that some of her folks were trying to take her little boy away from her. Jo Ann stated that she needed money for her to keep her son. She asked me for money and I told her I didn't have any money. We then started talking about robbing or burglarizing post office. We talked of burglarizing the Monett and Butterfield post offices as well as the bank at Purdy.

"We left the M & L Cafe early Thursday morning on December 23, 1965, with the intention of going to Butterfield post office to burglarize it. When we got to Butterfield I tried to get in a window of of the post office but I could not. I took a screwdriver, knocked a hole in the glass of the front door so I could reach in and open the door.

Jo Ann and I went in the post office and I pulled the safe out from the wall. I pulled it out from the wall about one foot. I do not know why I didn't go ahead and steal the safe but I did not. I do not know whose idea it was to take the letters from the Butterfield post office, but we took almost thirty letters. We took the letters out about eight miles west of town and opened them up. I did not find any money in the letters I opened and I don't know whether Jo Ann found any or not. We threw the letters that we had opened alongside the road."

"Postal Inspector Backus has told me that I do not have to make a statement. He also told me I could have a lawyer. But I don't want to wait. I have made this statement without being threatened or promised anything."

and the admission of the same constitute grounds for a reversal of a finding of guilty."

The indictment was returned in Kansas City on January 13, 1966. Cox was apprehended at Jacksonville, Florida, that evening. He was taken before a United States Commissioner. He consented to an order of removal. A warrant of removal was issued January 21 and he was delivered to the United States Marshal at Kansas City on January 27.

The statement in question was taken by Postal Inspectors Backus and Kershaw in a waiting room outside the cells in the Kansas City, Missouri, jail on the morning of February 17, 1966. Inspector Backus testified that Cox at first professed to recall nothing about Butterfield; that however, when he was told the inspectors had information from Mrs. Reagan, he conceded that he and the girl had been at Butterfield and had burglarized the post office; that Backus had advised Cox that "he did not have to tell me anything", that any statement could be used against him and "that he had a right to counsel, to a lawyer, or to anyone else that he wanted to talk to"; that Cox proceeded to talk; that Backus put down in writing what Cox said; that Cox read the statement and signed it; and that the statement was in Backus' handwriting except for the signature and except one paragraph [the last one quoted in footnote 2] which was in Cox's writing.

The government offered the statement in evidence. On examination by the defense the inspector repeated his description of the cautionary comment he had given to Cox and stated that Cox did not ask permission to see any lawyer and that he was not told the inspector had talked to Cox's daughter Stella. The defense then objected to the admission of the statement.

At this point the court excused the jury and invited the defense "to make your record with reference to your present objection". See Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Cox took the stand. He testified that he gave the statement; that he first told Inspector Backus he knew nothing of the Butterfield burglary; that if he had thought of burglarizing a post office it certainly would not have been the one at Butterfield because that was where he lived and there would not be enough money there to warrant the risk; that Backus told him he had evidence in addition to a sworn statement from Mrs. Reagan but did not disclose what that evidence was; that Backus also told him he had been at Tipton, Oklahoma, and had talked to Stella there; that he was given the impression that Stella in some way might become involved or hurt; that he told Backus that any time his daughter was involved "they could expect a retaliation * * * and I was referring to physical injury"; that he also told Backus if he kept Stella "out of it" he "would go ahead and sign the statement"; that he did not have a lawyer at the time; that he was arrested on January 13 in Jacksonville, Florida; that he "made requests, numerous of times, for an attorney"; that the first one he got to talk to was the lawyer appointed by the court after his removal from Jacksonville to Joplin; that he saw that lawyer after the statement had been signed; that he did not read the statement "Because I can't read with these glasses I have and my eyes are very weak"; and that Backus did not read it to him. On cross-examination Cox stated that Stella was now 17 or 18 years old, but until December 17, 1965, he had not seen her since she was five years old; that the United States Commissioner in Jacksonville did advise him of his rights and that "I didn't have to say nothing"; that without an attorney he asked for an order of removal; that this was not the first time he had been in a court and "had statements used and been talked with"; that lawyers had represented him in the past and had advised him that he did not have to talk and that any statement he made could be used against him; that he had four prior convictions and had been represented by counsel on two of these; and that his written statement was not vol-

untary because "I was afraid that in some way that my daughter would be called in on here. I didn't know what he had done, what she had been talked to about, so I made it with the understanding that I would be tried in Kansas City and that would be the end of it".

Inspector Backus then testified that the defendant was not threatened in any way regarding his daughter; that his interview with Cox lasted two hours; that during this period Cox did not request a lawyer or ask to see anyone; that he told Cox he had a statement from Mrs. Reagan; and that the statement "was there in front of me and he could have seen part of her handwriting". On cross-examination he said that he "may have read parts" of her statement to Cox; that he read to Cox the statement which Cox signed; and that Cox read it himself.

Inspector Kershaw corroborated Backus' testimony that Cox was told of his rights to remain silent and to have the services of an attorney; that he did not request a lawyer; that no promises, inducements or threats were made; that there was no threat to involve Stella; that Cox talked freely and voluntarily; that Cox wrote and inserted the paragraph in the statement and did so freely; and that Cox's statement was read to him and he read it himself. On cross-examination he stated that at the interview the defendant denied involvement in the Butterfield burglary for some time, perhaps an hour and a half. This concluded the hearing outside the presence of the jury.

Judge Hunter then announced his finding that the written confession was freely and voluntarily given after the defendant had been advised of his constitutional rights. The court stated that it reached that finding "not merely on the weight of the evidence, but actually beyond a reasonable doubt in this instance".

The jury was recalled. Inspector Backus resumed the stand. The statement from Cox was reoffered and received. On cross-examination Backus testified that he had read to Cox portions of the Reagan statement.

The defense introduced no evidence.

As we have noted, the sole question raised by the defense on its appeal is the propriety of the admission of Cox's written statement.

■ The defendant's trial took place on April 19, 1966. It thus was after the decision in *Escobedo* (1964) but before that in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (June 13, 1966). *Escobedo* is applicable but *Miranda* is not. Johnson v. New Jersey, 384 U.S. 719, 733–735, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

The defense stresses that Cox had been in custody for five weeks when the February 17 statement was taken; that he repeatedly had requested a lawyer; that all this time he was without counsel and not fully aware of his rights; that only when he learned that his daughter had been seen, and feared that she might become involved or hurt, did he sign the statement; that Inspector Backus did not advise the defendant of "his absolute right to remain silent"; that his self-inserted comment that he did not want to wait was the statement of a man who had made a negotiated confession; and that he saw a lawyer for the first time at his arraignment in Missouri on February 24. It is said that these facts parallel those of *Escobedo*; that Cox had become the accused; that he, as was Danny Escobedo, was in a critical posture because he had been told that Mrs. Reagan had implicated him; and that this was the stage where legal advice was most needed.

■ It is obvious, of course, that the confession facts here fall far short of the extreme ones present in *Escobedo*. It is true that inquiry and suspicion had focused on Cox; indeed, he was indicted the same day he was arrested in Florida. But Cox's alleged requests for a lawyer, so far as this record shows—and only his testimony supports the making of any such request—were confined to his incarceration period in Florida. He con-

cedes that the Commissioner there advised him of his rights. Inasmuch as an indictment had been returned, the sole matter before the Florida court was Cox's proper identification for purposes of removal to the Western District of Missouri. Rule 40(b) (3), Fed.R. Crim.P. United States v. Provoo, 16 F.R.D. 341, 343 (S.D.N.Y.1954). And Cox did not dispute his identity. The record is completely silent as to any request on his part for counsel after he was returned to Missouri. Clearly, he made no such request during the interview by Inspector Backus. Both Backus and Kershaw testified that Cox was preliminarily told he need not say anything and Cox himself conceded that he was so advised by the United States Commissioner in Florida.

■ In our view, the record amply and convincingly sustains Judge Hunter's finding that the confession was freely and voluntarily given. We think that no other conclusion could really have been reached. Inspector Backus' testimony and that of Inspector Kershaw in full corroboration are definitely and sufficiently supportive. The defendant's admitted past criminal activity, his confessed experience with criminal court procedure and with protective advice from lawyers who had represented him, his failure to respond to Inspector Backus' statement that he was entitled to a lawyer, and his not having seen his daughter for a dozen years until December 1965, all give a hollow ring to his claims of involuntariness and duress and of triggered reaction to Stella's name. This persuades us, on the cold record, just as it did Judge Hunter who saw and heard the live witnesses, that the confession was given freely and voluntarily and that this is so even "beyond a reasonable doubt".

■■ Miranda v. State of Arizona, supra, p. 478 of 384 U.S., at page 1630 of 86 S.Ct., recognizes that "Confessions remain a proper element in law enforcement" and, when given freely and without any compelling influences, are admissible in evidence. We hold that the gov-

ernment here sustained its burden of demonstrating the voluntary character of the statement, that the standards of *Escobedo* and of Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), were clearly met, and that the statement's admission in evidence was entirely proper. See Golliher v. United States, 362 F.2d 594, 598–99 (8 Cir. 1966); Pope v. United States, 372 F.2d 710 (8 Cir. 1967).

Affirmed.